NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO T.C.

No. 1 CA-JV 25-0114

FILED 06-11-2026

Appeal from the Superior Court in Maricopa County
No. JD43639
The Honorable Gregory Como, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate's Office, Mesa
By Seth Draper
*Counsel for Appellant Father*

Maricopa County Legal Advocate's Office, Phoenix
By Amanda L. Adams
*Counsel for Child*

Arizona Attorney General's Office, Phoenix
By Autumn Spritzer
*Counsel for Arizona Department of Child Safety*

---

## MEMORANDUM DECISION

Judge D. Steven Williams delivered the Court's decision in which Presiding Judge Daniel J. Kiley and Judge Cynthia J. Bailey joined.

---

**W I L L I A M S**, Judge:

¶1　　　　Eduardo C. ("Father") appeals the juvenile court's order terminating his parental rights. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2　　　　Mother[1] and Father never married but share one minor child ("Child") born in 2020. The three lived together with Maternal Grandmother for the first three months of Child's life before Father moved out. Over the next three months, "Father had no more than a handful of in-person visits" with Child. When Child was eight months old, Father was arrested and later convicted of Child Sex Trafficking, a Class 2 felony. The court sentenced Father to eight years' imprisonment.

¶3　　　　Mother began a relationship with a new boyfriend ("Boyfriend"). At times, Mother, Child, and Boyfriend lived with Maternal Grandmother. In 2023, Mother gave birth to Child's half-sibling ("Sibling"). Soon afterwards, Mother ended her relationship with Boyfriend. But Boyfriend maintained contact with Sibling and Child through Maternal Grandmother, visiting them each week.

¶4　　　　Paternal Grandmother regularly babysat Child when Child was a toddler and arranged phone and video calls between Father and Child. Father sent some letters and crafts to Child through Paternal Grandmother. After Paternal Grandmother allowed a different family member to spend time with Child against Mother's wishes, Mother stopped allowing contact between Paternal Grandmother and Child for a time.

¶5　　　　When Child was almost three years old, Mother and Child moved back in with Maternal Grandmother. Over the next year, Maternal Grandmother made at least four phone calls to the Department of Child Safety ("DCS") to report her concerns about Mother's parenting. During its

---

[1] Mother consented to the termination of her parental rights and is not a party to this appeal.

investigation, DCS received audio recordings of Mother physically and verbally abusing Child.

¶6　　　　In January 2024, DCS took temporary custody of Child and placed her with Maternal Grandmother. DCS petitioned for dependency. Father pled no contest to DCS's allegation that he was "unable to safely parent due to incarceration." DCS recommended a case plan of family reunification and, after confirming Father was permitted to have contact with children despite his felony conviction, facilitated weekly virtual visits between Father and Child. DCS also approved Paternal Grandmother for visits.

¶7　　　　During one visit, Paternal Grandmother revealed to Child that Father, not Boyfriend, was her biological father. Child was then four years old. After a few months of weekly visits, Child expressed resistance to visiting with Father. Child's anxious behavior, including bedwetting and night terrors, increased. DCS and Child's attorney requested that Child's visits with Father stop, or that the frequency of the visits be reduced. Over Father's objection, the juvenile court reduced the frequency of remote visits to twice a month. Child continued to have weekly visits with Boyfriend.

¶8　　　　In March 2025, DCS moved to change the case plan to severance and adoption, alleging the statutory ground of Father's felony length of sentence resulting in the deprivation "of a normal home for a period of years." A.R.S. § 8-533(B)(4). Father objected and requested a bonding and best-interests assessment to support his request that either Maternal or Paternal Grandmother be appointed as Child's guardian.

¶9　　　　The juvenile court scheduled a contested termination adjudication hearing to begin in June 2025. Ten days before the hearing, Father renewed his request for a bonding and best-interests assessment of Child's relationship with both grandmothers. On the day before the final day of trial, Father filed a supplemental list of exhibits, indicating he wished to admit the audio recordings of Mother abusing Child. Citing relevance and timeliness, Maternal Grandmother objected. Father acknowledged DCS disclosed the recordings weeks earlier, but he failed to supplement his exhibit list because he hoped the case would "settle." The court refused to admit the recordings into evidence, finding Father's request was untimely.

¶10　　　　After the conclusion of the termination adjudication hearing, at which Maternal Grandmother testified she wished to adopt Child, the juvenile court issued a detailed written order terminating Father's parental

rights and denying Father's motion for a bonding and best-interests assessment.

¶11 Father timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶12 Though fundamental, a parent's right to the care, custody, and control of his child is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11–12 (2000). To terminate parental rights, a court must find at least one statutory ground under A.R.S. § 8-533(B) by clear and convincing evidence, *id.* at 249, ¶ 12, and that termination is in the child's best interests by a preponderance of the evidence, *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). "We will affirm a termination order unless the juvenile court abuses its discretion or the court's findings are not supported by reasonable evidence." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 14 (2022).

¶13 Under A.R.S. § 8-533(B), one of the enumerated grounds for termination of parental rights is a parent's incarceration for a felony conviction "of such length that the child will be deprived of a normal home for a period of years." A.R.S. § 8-533(B)(4). Section 8-533(B)(4) offers "no bright line definition of when a sentence is sufficiently long to deprive a child of a normal home for a period of years." *Michael J.*, 196 Ariz. at 251, ¶ 29 (citation modified). Instead, the juvenile court:

> should consider all relevant factors, including, but not limited to: (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent [or permanent guardian] to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

*Id.* at 251–52, ¶ 29 (modified by *Timothy B.*, 252 Ariz. at 477, ¶ 27 (directing the juvenile court to also consider a permanent guardian in the fifth factor)).

**¶14** Father raises several issues on appeal. We address each in turn.

## I. Reasonable Evidence Supports the Juvenile Court's Statutory Ground for Terminating Father's Parental Rights

### A. Visitation

**¶15** Father argues DCS failed to make reasonable and diligent efforts to provide reunification services while Father was incarcerated. *See Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581–82, ¶ 20 (2021) ("Because parents incarcerated for a lengthy period still possess a fundamental liberty interest in the care, custody, and management of their children, DCS must make diligent efforts to preserve the family by providing services to assist parents in maintaining a bond with their children." (citation omitted)).

**¶16** Father's contact with Child (or lack thereof) is presumably relevant to factor two in the *Michael J.* analysis of the length-of-conviction statutory ground. DCS took custody of Child on January 26, 2024, but six months passed before Father received his first virtual visit with Child. Father also challenges the juvenile court's decision to reduce his visits to bi-weekly while maintaining Child's weekly visits with others, including Boyfriend and Paternal Grandmother.

**¶17** DCS explained it had an obligation to verify that Father was allowed to have contact with any child given the nature of his conviction, but experienced a delay (the cause of which is unclear from the record) after requesting Father's criminal records. Father objected to the delay but did not provide DCS with his criminal conviction records, despite a duty to do so. *See* Ariz. R.P. Juv. Ct. 315(a) (requiring a party to a dependency or termination proceeding to disclose to other parties all relevant information that is not privileged). After confirming Father was not prohibited from having contact with Child, DCS then sought a psychological consultation to ensure Child's mental safety. DCS explained that Child didn't know Father or have a bond with him. The court noted that Child was only months old when Father was incarcerated and had long believed Boyfriend to be her father. After Child's own statement that she didn't want to see Father and Child's reported dysregulation following her virtual visits with Father, the court reduced the frequency of the visits.

**¶18** The juvenile court concluded that DCS made reasonable and diligent efforts to provide services to Father despite the "obstacles to providing . . . parenting time due to the nature of [Father's] conviction." We affirm the juvenile court's factual findings when reasonable evidence and

inferences support them. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶ 30 (2023). While we acknowledge a delay in providing visitation to Father, the factual circumstances here, including the nature of Father's conviction, the limited nature of his relationship with Child before his incarceration, and Father's own failure to disclose the necessary criminal records, support the court's conclusion that DCS made reasonable and diligent efforts to provide visitation to Father while prioritizing Child's well-being.

### B. *Michael J./Timothy B.* Factors

**¶19** Father next argues the juvenile court erred in its analysis of the factors outlined by *Michael J.* in light of the modification provided by *Timothy B.*—namely that the court failed to properly analyze whether Father was incapable of providing a normal home life through a guardianship. *See Timothy B.*, 252 Ariz. at 477, ¶ 27. A "'normal home' does not necessarily require the incarcerated parent's physical presence." *Id.* at 476, ¶ 24. "[A] 'normal home' can consist of a home in which the child has a permanent guardian, and the birth . . . parent is not physically present in the home but has some relationship with the child that serves the child's best interests." *Id.* at ¶ 25.

**¶20** Father urged the juvenile court to reject termination and instead conclude that guardianship would serve Child's need for a safe and loving home while protecting Father's fundamental parental rights. To be sure, the court cannot ignore "the parent's interest in maintaining a positive parent-child relationship." *Id.* at 478, ¶ 31. And "the juvenile court should consider whether another person is willing to be the child's permanent guardian and . . . [whether] a guardianship would be in the child's best interests." *Id.* at 477, ¶ 27. But our supreme court firmly rejected the premise "that a court must give equal weight to a parent's interest in the custody and care of a child and the child's interests in security and stability" when making a best-interests determination. *Id.* at 478, ¶ 32. "[I]t is a given that the child's best interests predominate." *Id.* at ¶ 31.

**¶21** Father specifically challenges the juvenile court's analysis of factors one, two, five, and six. We do not reweigh evidence on appeal, *see Brionna J.*, 255 Ariz. at 479, ¶ 32, and accept the juvenile court's factual findings if reasonable evidence and inferences support them, *id.* at 478, ¶ 30.

**¶22** In its consideration of factor one—*length and strength of any parent-child relationship existing prior to incarceration*—the juvenile court found that "Father had no more than a handful of in-person visits with

[Child]" between the time he moved out of Maternal Grandmother's home (when Child was three months old) and his arrest and incarceration. Moreover, Child's therapist and both grandmothers acknowledged that Child believed Boyfriend to be her father until the age of four. The record supports these findings.

¶23        As to factor two—*the degree to which the parent-child relationship can be continued and nurtured during incarceration*—Father argues that Mother's "nomadic living situation" frustrated his ability to have consistent contact with Child before the dependency. Then, as explained above, Father experienced a delay in getting visitation arranged through DCS. He argues that if "the juvenile court had properly provided [him] with full visitation since the initiation of the case, his bond with [Child] would be that much stronger." But factor two focuses on *continuing* and *nurturing* the parent-child relationship during incarceration. Here, Father barely had a relationship with Child when he went to prison. Tellingly, Child believed Boyfriend to be her father. While Father made efforts during his incarceration to establish a relationship with Child as she grew, the court's conclusion that their relationship is "not likely to be a close parent-child bond" is supported by the record and reasonable inferences drawn from the record.

¶24        Father asserts that factor five—*the availability of another parent or permanent guardian to provide a normal home life*—should have weighed in his favor. Specifically, Father contends that Child could have a normal home life with a guardian while Father was incarcerated. *Timothy B.* directs the juvenile court to consider whether the incarcerated parent's affirmative acts contribute to, rather than detract from, the child's stable family environment with a permanent guardian. 252 Ariz. at 477, ¶ 27. The juvenile court heard testimony from Child's therapist and both grandmothers about the effect of visitation with Father on Child. The court concluded "Maternal Grandmother credibly testified that Father's visits with [Child] cause emotional upheaval for her." "Because the juvenile court is in the best position to weigh evidence and assess witness credibility, we accept the juvenile court's findings of fact if reasonable evidence and inferences support them." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016). The therapist's notes record that Child reported at multiple appointments not wanting to see Father. While there are supervised visitation notes documenting Child willingly engaged with Father, the notes also reflect Child said she didn't want to visit with Father, resisted engagement with Father, consistently ignored Father, and turned the camera away from herself. The record here supports the court's conclusion that this factor weighs in favor of termination.

**¶25** Lastly, Father challenges the juvenile court's analysis of factor six—*the effect of the deprivation of parental presence on the child*—concluding that depriving Child of Father's presence is unlikely to have a significant impact on her. The court reasoned that Father never established a normal parent-child relationship with Child, that Father has not seen Child in person for "approximately five years," and that Child views Boyfriend as her father. It is undisputed that Father has been incarcerated since Child was only months old and Child believed Boyfriend was her father until four-years-old. Although Father had virtual visits with Child, those visits, taken alone, do not constitute a normal parent-child relationship. Reasonable evidence and inferences support the court's findings. *See Brionna J.*, 255 Ariz. at 478, ¶ 30.

**¶26** The juvenile court did not abuse its discretion in its analysis of the *Michael J.* and *Timothy B.* factors in finding DCS proved the statutory ground of "felony length of sentence" by clear and convincing evidence as a basis for termination.

## II. Reasonable Evidence Supports the Court's Finding that Termination of Father's Parental Rights Was in Child's Best Interests

### A. Bonding and Best-Interests Assessment

**¶27** Next, Father argues the juvenile court erred by denying his motion for a bonding and best-interests assessment. Because the court failed to consider "the child's interests in an ongoing relationship with Father," he argues the court "ignored" his relationship with Child when weighing whether guardianship or termination was in Child's best interests. DCS counters that "the juvenile court's best-interests determination is distinct from any subsequent placement decisions, and a parent whose parental rights have been terminated lacks standing to challenge post-termination placement decisions or the child's adoption." *See In re O.M.*, 254 Ariz. 543, 545–46, ¶¶ 9–10 (App. 2023).

**¶28** In *In re O.M.*, the mother did not challenge the juvenile court's finding that statutory grounds for termination existed or that the best-interests findings proved termination of parental rights was in her child's best interests. *Id.* at 545, ¶ 8. Instead, she challenged only the court's placement determination. *Id.* She acknowledged that "generally, a parent lacks standing to challenge the placement of the child on appeal from the termination order." *Id.* at ¶ 9. But she argued that "a parent may do so if the juvenile court's placement determination was 'inextricably intertwined'

with the child's best-interests analysis." *Id.* (quoting *Antonio M. v. Ariz. Dep't of Econ. Sec.*, 222 Ariz. 369, 371, ¶ 3 (App. 2009)). This court rejected her argument. *Id.* at 546, ¶ 10.

**¶29** In essence, Father makes the same argument as the mother in *In re O.M.* Father argues a bonding and best-interests assessment would have guided the court when weighing whether guardianship or adoption was in Child's best interests, suggesting that the ultimate placement is "intertwined" with the best-interests analysis. He seems to argue that guardianship is in Child's best interests because such placement would provide for a continuing relationship with Father.

**¶30** But this argument fails. Once the juvenile court determined that termination was in Child's best interests because termination would provide stability and permanence, Father lacked standing to assert guardianship was in Child's best interests. Moreover, while Father's interest in the parent-child relationship is a consideration for the juvenile court, the child's interests are paramount. *Supra*, ¶ 20; s*ee Timothy B.*, 252 Ariz. at 478, ¶ 31. The juvenile court considered at length whether guardianship was in Child's best interests, *infra* ¶¶ 32–33, and concluded otherwise.

## B. "Guardianship" or "Termination and Adoption"

**¶31** Father argues the juvenile court abused its discretion in concluding that termination of Father's parental rights was in Child's best interests instead of a guardianship with either grandmother.

**¶32** The court's thorough 14-page ruling expressly considered guardianship, the possible guardians, and whether such placement would be in Child's best interests. The court "heard extensive testimony by" Mother, Father, both grandmothers, and Child's therapist. All who testified "agreed that [Child] loves both of her grandmothers." However, when asked by her therapist to identify people she trusts, Child included Maternal Grandmother, Sibling, and Boyfriend, along with a couple of other relatives, but did not mention Father or Paternal Grandmother. Her therapist testified that when discussing adults Child could potentially live with, Child was unaffected by the possibility of not seeing Father or Paternal Grandmother, but "was visually upset and scared" by the possibility of not seeing Maternal Grandmother again. The court concluded "[t]his is natural given that [Child] has lived with [Maternal Grandmother] for roughly 70% of her life."

**¶33** The juvenile court reasoned that guardianship opens the possibility of future litigation once Father is released from imprisonment, concluding this "would likely be very unsettling to [Child], even if" unsuccessful. The court also found that termination of parental rights was in Child's best interests "because it will allow her to be adopted. Adoption will provide [Child] with the benefits of permanency and stability." Given the strength of the relationship with Maternal Grandmother and the planned adoption, the court concluded "adoption is in [Child]'s best interest compared to a guardianship." The record also shows that Child is bonded with Sibling, who is also currently placed with Maternal Grandmother.

**¶34** We "view the evidence and reasonable inferences to be drawn from it in the light most favorable to sustaining the court's decision." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). Because extensive evidence supports the court's decision here, Father has not shown where the court abused its discretion in determining that termination was in Child's best interests.

## C. Excluded Evidence

**¶35** Lastly, Father sought to introduce audio recordings of Mother abusing Child while living in Maternal Grandmother's home. Father argues the court erred by excluding the recordings. He contends the recordings are relevant because "they go to the best interest of the child," inferring that continued placement with Maternal Grandmother was not in Child's best interests. DCS and Child (through Child's attorney) argue that Father's request was untimely because he waited more than two weeks after receiving the recordings to seek their admission, *supra* ¶ 9. DCS also asserts that Father failed to show prejudice he suffered because of the court's decision to exclude the recordings.

**¶36** We review the juvenile court's evidentiary rulings for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 60, ¶ 19 (App. 2015). We will not disturb the court's "decision absent a clear abuse of its discretion and resulting prejudice." *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 82–83, ¶ 19 (App. 2005) (defining an abuse of discretion as "manifestly unreasonable" or based on "untenable" grounds or reasons (quotation omitted)).

**¶37** Here, Mother admitted at trial she physically and verbally abused Child while living in Maternal Grandmother's home. That abuse prompted Maternal Grandmother to contact DCS. DCS's report for the

initial dependency and preliminary protective hearing summarized the abuse memorialized by the recordings, and that report was later admitted into evidence by stipulation. Consequently, the factual details of Mother's abuse of Child were already before the court. Father has not shown any prejudice he suffered as a result of the court refusing to admit the recordings into evidence.

¶38        Moreover, the juvenile court received extensive testimony from witnesses and from Child's therapist's notes about the strength of Child's bond with Maternal Grandmother and the safety Child feels in her care. The court emphasized that the "one constant, stable presence in [Child]'s life has been" Maternal Grandmother. Father alleges that because the abuse occurred in Maternal Grandmother's home, Child's placement there would not be in Child's best interests. But the evidence contradicts Father's assertion. The outcome Child truly fears is being removed from Maternal Grandmother. On this record, the court did not abuse its discretion in excluding the recordings.

## CONCLUSION

¶39        We affirm the termination of Father's parental rights.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:        JR